**SECURITIES and EXCHANGE COMMISSION, Plaintiff,**

v.

**COLONIAL INVESTMENT MANAGEMENT LLC, Colonial Fund LLC, and Cary G. Brody, Defendants.**

**No. 07 Civ. 8849(PKC).**

United States District Court,
S.D. New York.

July 7, 2009.

See also 2008 WL 2191764.

Mark K. Schonfeld, Valerie Ann Szczepanik, U.S. Securities and Exchange Commission, New York, NY, for Plaintiff.

Ira Lee Sorkin, Nicole Pappas De Bello, Dickstein Shapiro LLP, New York, NY, for Defendants.

Richard P. Swanson, Arnold & Porter, LLP, New York, NY, for Intervenors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

P. KEVIN CASTEL, District Judge.

The Securities and Exchange Commission ("SEC") brings this action against Colonial Investment Management LLC ("CIM"), Colonial Fund LLC ("Colonial"), and Cary G. Brody ("Brody") asserting multiple violations of Rule 105 of Regulation M under the Securities Exchange Act of 1934 ("Exchange Act"). 17 C.F.R. § 242.105; *see also* 15 U.S.C. § 78u(d)(1). The SEC claims that, with respect to eighteen public secondary offerings between 2001 and 2004, defendants, a hedge fund and an affiliated person and entity, violated Rule 105 by using shares purchased in the offerings to cover short sales that they effected during the five business days before the pricing of those offerings. The SEC seeks a final judgment permanently enjoining defendants from further violations of Rule 105, ordering defendants to disgorge any ill-gotten gains, including prejudgment interest, and imposing a civil monetary penalty on Brody.[1] The case was tried to the Court without a jury on May 5–7, 11–12, and 18, 2009. This Opinion sets forth the Court's Findings of Fact and Conclusions of Law.[2] Fed.R.Civ.P. 52(a). For the reasons explained below, the Court finds that the SEC has proven that defendants violated Rule 105 on each of the eighteen alleged transactions, and that a permanent injunction, disgorgement, and a civil penalty are all warranted.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. *Short Selling*

1. A "short sale" is defined as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." 17 C.F.R. § 242.200(a). Short selling can be a logical trading strategy for a trader who believes that the price of shares is likely to decline over the near-term. *See Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir.1998). To sell short, the trader typically borrows the shares from a broker who obtains them either from its own reserves or from an external source. *See id.* The trader then sells the borrowed shares in the open market. *See id.* At this point, the trader has an "open short position" in the stock. At some point in the future, the trader "covers" the short position by purchasing an identical number of shares and returning them to the lender. *See id.* If,

---

1. Four outside investors in Colonial, Felicia Pierot Brody, Edward Pierot, Robert Pierot, and Frank W. Birnie, have intervened for the limited purpose of addressing the issue of disgorgement. Fed.R.Civ.P. 24.

2. To the extent any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice versa. Citations to the record are not intended to imply that the cited portion of the record is the only support for the Court's finding.

as the trader hopes, the share price declines, the trader earns a profit equal to the difference between the price at which she sold short and the price at which she purchased the shares back to cover the short position (not taking into account fees or commissions). *See id.* Short selling can be "extremely risky" because if the stock price rises, the trader must cover the short position at a loss. *Id.*

■ 2. As a general rule, short selling is a permissible and "well-established securities trading practice[ ]." *Id.* (footnote omitted). Indeed, the SEC "has long held the view that short selling provides the market with important benefits, including market liquidity and pricing efficiency." SEC Release No. 34–59748, 74 Fed. Reg. 18042, 18044 (Apr. 20, 2009). But "[a]lthough short selling serves useful market purposes, it also may be used to illegally manipulate stock prices." *Id.* (footnote omitted). Thus, the SEC has promulgated various restrictions on short selling.

## B. *Secondary Offerings*

3. A secondary offering—also referred to as a "follow-on offering"—is an issuance of shares by a company that already has had an initial public offering. Shares from secondary offerings are often sold to buyers, such as institutional investors or retail networks, through a "syndicate," consisting of lead managers ("book runners") among other members. The syndicate members are broker-dealers who underwrite the secondary offering. *See* Kanterman Decl. ¶ 6; Watson Decl. ¶ 5.[3]

4. To purchase shares in a secondary offering, a prospective buyer must "indicate" an interest for a certain quantity of shares by communicating with a member of the syndicate. Tr. 14. An indication is only a request for shares, and is not binding. Tr. 16.

5. On the date set as the "pricing date," after the market closes, the price of the secondary offering is set by a negotiation between the book runners and issuer. *See* Kanterman Decl. ¶ 8. Before the market opens on the next trading day, the shares are "allocated" to buyers that have made an indication of interest. Each buyer is then notified of the number of shares it has been allocated, and the buyer must accept or reject that allocation. Once all newly offered shares have been allocated and accepted, the syndicate "breaks" and the offering "terminates." At that point, the allocated shares can trade free of restriction. Typically, an offering terminates before the market opens for trading on the day of allocation. *See id.* ¶¶ 9–10; Watson Decl. ¶¶ 11, 13, 17.

## C. *Rule 105*

6. Rule 105 "govern[s] short selling in connection with a public offering," such as a secondary offering. *Anti–Manipulation Rules Concerning Securities Offerings,* 1996 WL 734255, at *4 (Dec. 20, 1996) ("December 1996 Release").

### 1. *The Rule at the Time of the Alleged Violations*

■ 7. The SEC alleges that defendants violated Rule 105 with respect to

---

**3.** Citations will be abbreviated as follows: Witnesses' declarations are referred to as "[Last Name] Decl. ¶ __." Stipulations from the Joint Pre–Trial Order, adopted by Order of the Court dated February 17, 2009, are referred to as "PTO Stip. __." The trial transcript is referred to as "Tr. [page]." Plaintiff's exhibits are referred to as "PX-__" and defendants' exhibits are referred to as "DX-__." A stipulation between the parties executed on May 29, 2009 is referred to as "Stip. 5.29.09. ¶ __." The transcript from the final pre-trial conference, held on the record on May 4, 2009, is referred to as "FPTC [page]." The amended complaint is referred to as "Amended Compl. ¶ __."

eighteen secondary offerings that took place between 2001 and 2004. At that time, Rule 105 provided, in pertinent part, that "[i]n connection with an offering of securities for cash pursuant to a registration statement ... filed under the Securities Act, it shall be unlawful for any person to cover a short sale with offered securities purchased from an underwriter or broker or dealer participating in the offering, if such short sale occurred during ... [t]he period beginning five business days before the pricing of the offered securities and ending with such pricing...." 17 C.F.R. § 242.105(a) (2006). This five-day timeframe is referred to as the "restricted period." Thus, Rule 105 prohibited covering a short sale with securities purchased in a registered offering if the short sale occurred during the restricted period.

## 2. *The Purpose of Rule 105*

8. The SEC has explained that the purpose of the rule is "to prevent manipulative short selling prior to a public offering by short sellers who cover their short positions by purchasing securities in the offering, thus largely avoiding exposure to market risk. Such short sales could result in a lower offering price and reduce an issuer's proceeds." December 1996 Release, 1996 WL 734255, at *35. The SEC has further explained:

> The reason for the prohibition is that pre-pricing short sales that are covered with offering shares artificially distort the market price for the security, preventing the market from functioning as an independent pricing mechanism and eroding the integrity of the offering price. Prices of "follow-on offerings" are typically based on a stock's closing price prior to the time of pricing, and thus short sales during the period immediately preceding pricing that reduce the market price can result in a lower offering price. The goal of Rule 105 is

> to promote offering prices that are based upon open market prices determined by supply and demand rather than artificial forces.... A trader who sells short pre-pricing and knows or has a high degree of assurance that he will be able to obtain covering shares in the offering does not assume the same market risk as a short seller who intends to cover using open market shares, and may not be contributing to pricing efficiency and true price discovery. Therefore, the rule prohibits pre-pricing short sales, effected within five days of pricing of an offering, from being covered with offering securities acquired from an underwriter or other broker-dealer participating in the offering. Moreover, this manipulative conduct can negatively affect the issuer, which receives reduced offering proceeds as a result of the lower offering price, and harms the market by inhibiting the capital raising process. In addition, the presence of such shorting activity can lead other investors, who believe that the short selling is the result of an evaluation of the stock's value, to sell short as well. By prohibiting such artificial selling activity, the Rule contributes to the integrity of the capital raising process.

Short Sales, 69 Fed. Reg. 48008, 48020 (Aug. 6, 2004) ("August 2004 Release") (footnotes omitted).

## 3. *SEC Guidance on Rule 105*

9. On November 6, 2003, the SEC proposed rules that included amendments to Rule 105. Short Sales, 68 Fed. Reg. 62972 (Nov. 6, 2003) ("November 2003 Release"). The SEC stated:

> Recently, the Commission has become aware of, and taken action, with respect to conduct designed to evade, but which violates Rule 105.... This conduct may involve short sales within the restricted

period of Rule 105, the purchase of offering shares, and the contemporaneous sale and purchase of the same class of shares as the offering shares. For example, an individual may sell the shares in the market and immediately purchase an equivalent number of shares. Where the transaction is structured such that there is no legitimate economic purpose or substance to the contemporaneous purchase and sale, no genuine change in beneficial ownership, and/or little or no market risk, that transaction may be a sham transaction. The Commission would continue to consider enforcement action against those participating in sham transactions structured in a manner to give the appearance of compliance with Rule 105, but in fact, violate the rule. We are not proposing revisions to Rule 105 with respect to activities that violate the current rule. We seek comment, however, on criteria in addition to economic purpose or substance, change in beneficial ownership, and market risk, that may distinguish sham transactions from legitimate trading.

*Id.* at 62999 (footnote omitted).

10. On August 6, 2004, the SEC "issue[d] interpretive guidance to address transactions that violate Rule 105 by utilizing offering-shares to cover short sales made in the pre-pricing restricted period, while structuring the transactions so as to falsely give the appearance that the short sale has been covered using shares purchased in the open market. Transactions structured in this way violate Rule 105." August 2004 Release, 69 Fed. Reg. at 48021. As an "illustrative" example of a "sham transaction" that violates Rule 105, the SEC described a situation in which

> a trader effects pre-pricing short sales during the Rule 105 restricted period, receives offering shares, sells the offering shares into the open market, and

then contemporaneously or nearly contemporaneously purchases an equivalent number of the same class of shares as the offering shares, which are then used to cover the short sales. Where the transaction is structured such that there is no legitimate economic purpose or substance to the contemporaneous purchase and sale, no genuine change in beneficial ownership, and/or little or no market risk, that transaction may be a sham transaction that violates Rule 105.

*Id.* (footnote omitted); *see also* Proposed Rules, 71 Fed. Reg. 75002, 75004 (Dec. 13, 2006)

("December 2006 Release") ("Once the restricted period short sale is executed and the person purchases . . . the offered securities, the position is economically flat. A contemporaneous or nearly contemporaneous post-offering purchase and sale does not undo the Rule 105 violation.") (footnote omitted). An example of this would be where

> an individual places limit orders to sell and buy the same amount of shares, and the transaction is crossed in the individual's brokerage account. There is no change in beneficial ownership and no market risk associated with the transaction, i.e., these are "wash sales." Although the individual has attempted to disguise the fact that the offering shares are being used to cover the short sale, in fact, he is covering his pre-pricing short sale with shares obtained in the offering.

August 2004 Release, 69 Fed. Reg. at 48021 n. 126 (citing *Ascend Capital, LLC*, Securities Exchange Act Release No. 48188 (July 17, 2003)). The SEC explained that it was "not . . . necessary or desirable to add rule language to address these kinds of trading, as this activity violates the current rule and can vary in its details." *Id.* at 48021.

11. Also in the August 2004 Release, the SEC eliminated the "shelf offering exception." *Id.* at 48020. Prior to this amendment, Rule 105 did not apply to shelf offerings filed under Rule 415. See November 2003 Release, 68 Fed. Reg. at 62998.

#### 4. *Amendments to Rule 105*

12. On December 13, 2006, the SEC, noting the "evidence of non-compliance with the current rule," proposed "amending Rule 105 to make it unlawful for a person to effect a short sale during the Rule 105 restricted period and then purchase, including enter into a contract of sale for, such security in the offering." December 2006 Release, 71 Fed. Reg. at 75002. On August 10, 2007, the SEC stated that it was adopting an amendment to Rule 105 that "changes the prohibited activity from covering to purchasing the offered security, in order to put an end to strategies that obfuscated the prohibited covering but replicated its economic effect." Final Rule, SEC Release No. 56206, 2007 WL 2254466, at *5 (Aug. 10, 2007) (footnote omitted) ("August 2007 Release"). The SEC noted that "[t]he prohibition on purchasing offered securities also provides a bright line demarcation of prohibited conduct consistent with the prophylactic nature of Regulation M." *Id.* (footnote omitted).

13. Thus, effective October 9, 2007, amended Rule 105 provides that "[i]n connection with an offering of equity securities for cash pursuant to a registration statement ... filed under the Securities Act ..., it shall be unlawful for any person to sell short ... the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the [Restricted Period]." 17 C.F.R. § 242.105(a) (2009). Amended Rule 105 generally prohibits purchasing a security in a registered offering if the buyer has a restricted period short position in that security. The transactions at issue in this case occurred prior to the October 2007 amendments to Rule 105.

#### 5. *Alleged Violations of Rule 105*

14. The SEC claims that defendants violated Rule 105 between 2001 and 2004, before the rule was amended in 2007. The SEC alleges that defendants violated Rule 105 by covering restricted period short positions with shares purchased in secondary offerings of eighteen issuers: CoorsTek Inc. ("CRTK"), Intersil Corp. ("ISIL"), Endo Pharmaceuticals Holdings Inc. ("ENDP"), The Midland Co. ("MLAN"), Cubist Pharmaceuticals Inc. ("CBST"), Essex Corp. ("KEYW"), Nastech Pharmaceutical Company ("NSTK"), Legg Mason, Inc. ("LM"), Technical Olympic USA, Inc. ("TOUS"), SupportSoft, Inc. ("SPRT"), White Electronic Designs Corp. ("WEDC"), Net2Phone Inc. ("NTOP"), Komag, Inc. ("KOMG"), Palmsource Inc. ("PSRC"), Integrated Silicon Solutions, Inc. ("ISSI"), Pain Therapeutics Inc. ("PTIE"), Atari Inc. ("ATAR"), LCC International Inc. ("LCCI").[4] (Amended Compl. ¶¶ 19–55.) With respect to all of these transactions, it is undisputed that defendants were allocated shares in the secondary offerings and it is undisputed

---

**4.** The SEC also submitted evidence that defendants violated Rule 105 in connection with secondary offerings by Mapinfo Corp. ("MAPS"), Fossil Inc. ("FOSL"), The First Marblehead Corp. ("FMD"), and UTI Worldwide Inc. ("UTIW"). *See, e.g.,* Ferrante Decl. ¶¶ 16(k)-(n). Although these violations are not alleged in the amended complaint, the SEC argues that this evidence is admissible under Rule 404(b), Fed.R.Evid. The Court finds it unnecessary to consider this evidence in determining either liability or relief.

that, at the time of each allocation, defendants had a restricted period short position in the stock. Thus, the central issues to be tried were (1) whether defendants used shares from the allocations to cover their restricted period short positions, and (2) if so, what relief, if any, should be granted.

15. With respect to seven of the transactions, defendants conceded before trial (MLAN, CBST, KEYW, NSTK, and LM) or at trial (CRTK and ENDP) that their trades violated Rule 105. *See* Tr. 587–88, 600–601, 652–54, 717, 788–89; *see also* FPTC at 3, 5–6. Thus, with respect to those seven transactions, liability has been established and the sole remaining issue is relief.[5]

16. Of the eleven transactions for which liability was not conceded, with respect to ten of them (WEDC, ATAR, PTIE, TOUS, SPRT, NTOP, LCCI, KOMG, ISSI, and PSRC), the SEC further alleges that defendants structured their trading with "sham transactions" designed to hide their unlawful activity. (*See* Amended Compl. ¶¶ 32, 34, 36, 38, 40, 42, 44, 46, 48, 50.)

## II. COLONIAL

### A. *Management and Structure*

17. Colonial is a private hedge fund headquartered in New York, New York. Colonial holds itself out as a private investment company under Section 3(c)(1) of the Investment Company Act of 1940. 15 U.S.C. § 80a–3(c)(1).

18. Colonial was formed in 1998 by Brody and Jeffrey Miller, among others. J. Miller Decl. ¶ 4. Brody and Miller are Colonial's two principals. Brody Decl. ¶ 4; Tr. 413–14. Brody and Miller also are the managing directors of, and are investors in, Colonial. PTO Stip. 5; Brody Decl. ¶ 9; *see* J. Miller Decl. ¶ 4.

19. CIM is Colonial's managing member and adviser. CIM's managing member is Colonial Asset Management Advisors, Inc., of which Brody is the sole principal and president. PTO Stip. 4; PX–112 at CFLLC 0000599–600.

20. Brody and Miller are both sophisticated professional traders.

21. Brody began his career in the securities business in 1992 as a cold caller with Merrill Lynch. From 1992 to 1993, he worked for Weiskopf Silver Equities as an assistant trader and back office reconciler and he also traded equities and convertibles. Brody Decl. ¶ 7. He graduated with a degree in finance, passed his Series 7 examination to become registered as a securities broker, and has taken courses in accounting and risk management. *Id.* ¶¶ 5–6; Tr. 462. In 1994, Brody joined A.F. Bruan & Company, where he traded equity securities and managed a team of traders. Brody Decl. ¶ 8; Tr. 463.

22. Brody is Colonial's president, head portfolio manager and head trader. Tr. 463. He supervised all traders and other portfolio managers at Colonial. *See* Tr. 318–19, 463–64, 634. At all relevant times, Brody supervised Colonial's back office operations. Tr. 464, 634. Brody ultimately

---

**5.** The SEC's complaint asserts only one claim for relief, *i.e.*, that defendants violated Rule 105. (*See* Amended Compl. ¶ 57.) Because defendants have admitted to seven violations of Rule 105, defendants' liability on this one claim is conceded, and the sole issue in dispute is relief. *See* FPTC at 5–6. But the question of whether defendants committed the additional violations of Rule 105 alleged in the complaint, and the amount of gains or losses associated with any such violations, are relevant to a determination of the appropriate relief. Thus, the Court will review the evidence pertaining to all eighteen allegedly violative transactions.

is responsible for all of Colonial's trading and investment decisions. Tr. 336, 476; PX–112 at CFLLC 0000600. Brody was responsible for covering open short positions at Colonial and for ensuring that those covering transactions did not run afoul of Rule 105. Brody Decl. ¶ 16; J. Miller Decl. ¶ 52.

23. Miller played a lead role in indicating an interest for Colonial in secondary offerings. J. Miller Decl. ¶ 7; Brody Decl. ¶ 11; Tr. 515.

24. During the period of 2001 through 2004, Miller researched and analyzed approximately thirty-five secondary allocations per week. Tr. 418. He prepared memoranda in connection with his secondary offering research. Tr. 417. Miller sometimes shared his secondary offering research with Brody. Tr. 535.

## B. *Prime Brokers and Trading Systems*

25. During the relevant time period, Colonial had two prime brokers: Banc of America Securities LLC ("BAS") from November 2000 until early 2003; and Goldman Sachs Execution and Clearing ("GSEC") from 1998 to 2000 (when Colonial switched to BAS) and 2003 (when Colonial switched back to GSEC) to the present. *See* Lewis Decl. ¶ 7; D. Miller Decl. ¶ 6.

26. Colonial's prime broker for the relevant transactions in CRTK and ISIL was BAS, and for all other relevant transactions was GSEC.

27. A prime broker is a broker that settles and clears trades for its customers, whether those trades are executed at the prime broker or elsewhere, and also performs various record keeping functions for its customers. D. Miller Decl. ¶ 6. "Settling" means processing a purchase and delivery of a purchase or sale of a security.

"Clearing" means recording the owner of a security that is purchased or sold. Lewis Decl. ¶ 5. It is a customer's responsibility to report its trading accurately and to otherwise instruct its prime broker so that the prime broker can properly settle and clear trades. *See* D. Miller Decl. ¶ 8; PX–26.

28. Colonial reported its daily trading activity to its prime broker at the end of each day. Brody Decl. ¶ 22. Before the market opened for trading the next trading day, Colonial received reports from its prime brokers, which revealed Colonial's securities positions and trading profit and loss figures ("P & L") as of the close of the market on the previous trading day. D. Miller Decl. ¶ 31; Tr. 212–13, 356, 359. Colonial's back office made sure that the equity positions and P & Ls reported by the prime brokers matched what Colonial believed they should be. Tr. 356. If there was a discrepancy in the equity positions or P & Ls, Colonial's back office and its prime broker engaged in a reconciliation. Tr. 362–63. Colonial's prime broker also received trade reports from various executing brokers utilized by Colonial. The prime broker then compared Colonial's reports with the executing brokers' reports and sought to reconcile any discrepancies (or "trade breaks") between Colonial and its executing brokers by the open of the next trading day. D. Miller Decl. ¶ 14.

29. Colonial placed its trades with various executing brokers or directly through the Routing and Executing Dot Interface ("REDI") or Instinet ("INET") systems (discussed below), and reported the trades daily to its prime broker. Both prime brokers provided defendants with daily summaries reflecting positions and profit and loss data as of the close of the prior trading day, and defendants could access those reports at any time. Tr. 56, 104–05, 212–13, 359, 361–62, 411, 539–40, 763–64.

### 1. *Banc of America Securities LLC*

30. BAS customers interfaced with BAS through a secure internet portal, "primebroker.com," through which they could access information, post trade activity and view various reports concerning their account. BAS customers could also use a software application called "Trade Blotter" to upload their daily trading activity electronically to BAS for processing. Lewis Decl. ¶ 8.

31. Unless a customer elected otherwise, BAS used a First–In–First–Out ("FIFO") liquidation method, meaning that oldest short positions were covered first. Tr. 119–22. Customers could choose a different liquidation method, whether for all of their transactions or on a transaction-by-transaction basis, by instructing BAS representatives or by entering the changes themselves into BAS's system. Tr. 121–22. BAS records indicate that Colonial's prime brokerage account used a FIFO liquidation method at all relevant times. Lewis Decl. ¶ 29.

### 2. *Goldman Sachs Execution & Clearing, L.P.*

32. During the relevant time period, Colonial had two prime brokerage accounts at GSEC. D. Miller Decl. ¶ 10. Account 7SE2 was (and still is) a "direct" client account. Account 4VF5, which was opened in July 1998 and closed in August 2005, was an "introduced account," introduced by Carlin Equities Corp. ("Carlin"). Id. ¶ 11. Each of these two "base accounts" had subaccounts associated with it. Id. ¶ 18. One of the subaccounts, referred to as a type "1309" "short against the box" or "short vs. box" account, enabled GSEC customers to hold a short position open "against the box," that is, to maintain a short position in a stock while also holding a long position in that stock. Tr. 215–16.

33. GSEC's standard practice was that if a customer had a short position in a particular security in a particular base account and the customer purchased or otherwise acquired shares of that security, those purchases and receipts would be netted against the open short position. However, the customer could give specific instructions otherwise. D. Miller Decl. ¶ 20; Tr. 233–34. GSEC customers can be short against the box only if the short position is held in a "1309" "short against the box" subaccount and the long position is held in a different subaccount. D. Miller Decl. ¶ 21; Tr. 215–216. Brody knew about the "short against the box" subaccount and used it in connection with certain IPO's. Tr. 234–35, 512–13, 548–50.

34. GSEC's custody reporting system netted all purchases at the end of each trade day, but defendants could have instructed GSEC not to cover a short position with certain shares. D. Miller Decl. ¶ 20; Tr. 232–33. Short positions were collapsed, or covered, unless a customer instructed GSEC to hold the short position open using a "1309" "short against the box" subaccount. D. Miller Decl. ¶ 21. Colonial never instructed GSEC regarding whether certain purchases of shares by Colonial should or should not be used to cover existing short positions in Colonial's account. *See id.* ¶ 24.

35. Many of the trades cleared by GSEC were entered by Colonial traders using the REDI or INET system.

### a. *REDI and INET*

36. From 1999 to 2005, Colonial licensed its office space from Carlin. Colonial was a customer of Carlin. Kornfeld Decl. ¶ 9. Carlin provided Colonial with access to INET, an electronic securities order trading and information system, having the capability to receive and execute orders within milliseconds. Carlin also

provided Colonial with access to REDI, an electronic trading platform provided by GSEC, which also had the capability to receive and execute orders within milliseconds. *Id.* ¶¶ 6, 9. Carlin provided Colonial's personnel with INET and REDI terminals for their trading. *Id.* ¶ 9. Carlin cleared Colonial's trades through GSEC. *Id.* ¶ 7.

37. Orders entered for execution in INET or REDI were either filled during the trading day or expired automatically at the end of the trading day. *Id.* ¶ 19. Colonial traders had the ability to monitor their positions and trading through these systems at all times during the trading day and could change or cancel an unfilled or partially filled order up until the order either was filled in full or expired at the end of the day. *Id.* ¶ 19. Brody was assigned the unique supervisory user code, U52852, to use these systems, and had the ability to trade in any account linked to Colonial, and to view and change any order in any account linked to Colonial. *Id.* ¶ 10; Tr. 33–34. INET and REDI electronic order tickets reflect order and execution information concerning Colonial's trading. Kornfeld Decl. ¶ 12; PX–2; PX–3A; PX–3B; PX–4; PX–204; PX–205.

## C. *Back Office*

38. From 2001 through 2004, Colonial's back office consisted of Andrew Salis, Claudia Hawkes and Erica Shaw. Salis Decl. ¶ 5; Brennan Decl. ¶ 5.

39. During this time period, none of Colonial's back office personnel informed Colonial's prime broker whether certain newly purchased shares should or should not be used to cover an existing short position. Salis Decl. ¶ 31.

40. During the time that Colonial was a customer of BAS, Colonial reported trading data electronically, either by keypunching the data directly into the "Trade Blotter" software application, or by entering the data into a Microsoft Excel spreadsheet and uploading it through Trade Blotter. Tr. 71, 80, 145, 345.

41. Colonial's handwritten blotters were not written in chronological order. J. Miller Decl. ¶ 40; Tr. 526. Sometimes, but not always, markings on the blotters, such as squiggly lines or arrows, purported to indicate whether a certain purchase of stock was intended to cover a specific short position. However, such notations were not communicated to the prime broker. Tr. 516, 522, 690–92, 695.

## D. *Accounting*

42. Michael Mezzapelle has provided accounting services to Colonial since 1998. Mezzapelle Decl. ¶ 6.

43. Brody's testimony at trial to the effect that Colonial did not liquidate its trading positions internally using FIFO was not credible. During the SEC's investigation, Brody testified that he used the FIFO method to cover a pre-existing short position before taking another position in that stock. Tr. 495–97.

44. Colonial's audited financials for the year ended December 31, 2007 disclose: "Realized gains and losses are computed by use of the first-in-first-out method. . . ." PX–269 at 9. Brody testified at trial that this statement did not apply to Colonial, because it referred to long term capital gains and losses and that Colonial does not have such gains and losses. Tr. 488. But the audited financials do not contain that limitation. It is unlikely that Colonial's auditors would have described as a significant accounting policy something that does not apply to Colonial. The audited financials are given to and relied upon by investors and most certainly relate to Colonial's business. Tr. 488. Although earlier financial statements do not disclose a particular

method for computing realized gains and losses, there was no evidence that Colonial had disclosed any change of significant accounting policies, which one would expect to see if there had been a change to the FIFO methodology.

45. Defendants' claim that they used a system known as "real time" accounting, rather than FIFO, for internal accounting purposes is not credible. Colonial's hand-written blotters, which supposedly provided the data of Colonial's own internal P & L calculations, were disorganized and inconsistent, and could not have been reasonably relied upon by Colonial's accountants. In fact, defendants' own expert, DeRosa, testified that the blotters are "very difficult to read" and "frankly, very sloppy." Tr. 794. Moreover, Colonial's accountants also relied on the monthly P & L reports from Colonial's prime brokers, which were generated using the FIFO methodology. Additionally, the audited financials do not refer to "real time" accounting, and such a statement would conflict with the statement in the audited financials for the year ended December 31, 2007, which refers specifically to FIFO. *See* PX–269 at 9.

46. BAS's "Realized Gain & Loss" reports calculated Colonial's P & L on a FIFO basis. PX–15;PX–19;Tr. 101–06.

47. If Colonial had wanted B AS to use a method of liquidation other than FIFO, it could have requested a different accounting method. Tr. at 121. There is no credible evidence that Colonial requested that BAS use anything other than FIFO for Colonial's prime brokerage account. Evidence was introduced showing that Colonial selected "LIFO" and not "FIFO" when opening an account with BAS. PX–81 at SEC 0094860; Tr. 140–42. However, there was a gap of over one hundred pages between this document and the preceding documents in the exhibit. Although the Tax ID number on the document corresponds to Colonial, see Tr. 483, 499–500, it is not clear whether this document pertained to Colonial's prime brokerage account or some other account that Colonial had at some time with BAS. Thus, the probative value of this document is very low.

48. GSEC employed an accounting software called Advent Geneva, which used a FIFO liquidation method for accounting purposes. Tr. 213–14. The system kept track of which lots of short shares are covered with which lots of long shares. Tr. 233–34. GSEC told Colonial that it used FIFO. Tr. 232. Colonial provided printouts from GSEC's accounting system, reflecting realized gains and losses, to Mezzapelle, Colonial's accountant. Tr. 764; PX–289.

49. It is more likely than not that Colonial knew that BAS and GSEC were liquidating Colonial's trades using the FIFO method. Brody had access to the prime brokers' equities position and profit and loss reports and knew or should have known that both firms used FIFO. *See* Tr. 119–22, 212–14, 232. Defendants provided Mezzapelle with reports from the prime brokers' systems. Colonial's back office and Mezzapelle relied on these reports in reconciling Colonial's P & Ls. Tr. 763–64; PX–289; PX–290.

E. *Internal Compliance System*

50. During the relevant period, Colonial did not have in place a system of internal controls adequate to monitor trading and prevent violations of Rule 105. Today, Colonial's system remains inadequate to prevent unlawful trading.

1. *System in Place at the Time of the Alleged Violations*

51. Brody failed to ensure that Colonial's back office personnel were trained in

how to comply with Rule 105. *See* Tr. 576–77. Moreover, he believed that these personnel were very sloppy. Tr. 577. The head of the back office did not recall Brody discussing Rule 105 with the back office employees tasked with reporting Colonial's trades to its prime brokers. *See* Tr. 401–03, 777.

52. Colonial did not adequately explain Rule 105 to its traders. Brett McDonald, a Colonial trader, testified that Brody did not communicate with him about the rules and regulations applicable to trading. McDonald was unfamiliar with Rule 105. Tr. 334–36.

53. Margaret–Mary Brennan, who worked as Colonial's office manager, human resources manager, accountant liaison, and who sometimes reported trade information to Colonial's prime brokers, did not understand Rule 105's prohibitions. Tr. 777; Brennan Decl. ¶ 4.

54. Miller, co-founder of Colonial, principal of the firm and the individual who Brody alleges is responsible for purchasing allocated stock and selling it into the market, could not specify any steps that defendants took to avoid violating Rule 105. Tr. 435–37. Miller personally took no steps to determine whether Colonial had an open short position in a stock before purchasing allocated shares, and he was unaware of anyone else taking such steps even though Colonial established restricted period short positions and purchased allocated shares in the same account. Tr. 424–25. Similarly, Brody and other employees know of no steps taken to ensure that defendants' back office complied with Rule 105. Tr. 354–56, 401, 576–77.

55. Defendants took no steps to instruct Colonial's prime brokers as to which shares should be used to cover specific short positions. Tr. 515–16, 774; Brennan Decl. ¶ 13; Salis Decl. ¶ 17; Maltz Decl. ¶ 6. The sole exceptions (discussed below) were defendants' trades in CRTK and ISIL, where defendants marked their allocations "CS," thereby instructing BAS to use those shares to cover Colonial's short positions in those stocks. *See* Lewis Decl. ¶¶ 14–17.

56. Brody maintained a careless attitude toward Colonial's compliance obligations. Vince DeMarco, who manages Colonial's middle and back office operations and currently serves as compliance officer, holds no securities industry licenses. Tr. 577–78. Brody was responsible for hiring DeMarco but did not believe that DeMarco had any compliance experience prior to joining Colonial. Tr. 573–76. According to Brody, he was unaware of any training that DeMarco had concerning rules and regulations applicable to short sales. *Id.* Miller indicated that he had no input whatsoever into the hiring of DeMarco, did not know for what position Brody had hired DeMarco, and took no steps to ascertain anything about DeMarco's background or qualifications at the time he was hired. Tr. 429.

57. Brody testified that prior to hiring DeMarco in 2002 or 2003, Colonial hired someone named Sam Weiser for marketing. Tr. 564. Brody "ended up" making Weiser Colonial's compliance officer and Chief Financial Officer because marketing was "going slow." *Id.* Brody indicated that he did not believe Weiser had any compliance experience or held any securities industry licenses. Tr. 565. Miller indicated that he had no input into the hiring of Weiser, did not know whether Weiser had any compliance function and did not know whether Weiser had a compliance background. Tr. 427–28.

58. According to Brody, Weiser drafted a compliance manual that was distributed to all Colonial employees in 2003 or 2004. *See* Tr. 581. However, Colonial's trader

McDonald testified that Colonial had no compliance manual during that time period. Tr. 333. Colonial produced only one edition of a compliance manual to the SEC in response to a document request for all such manuals, and that document bears the date October 1, 2005. Tr. 579–84; PX–73. At no time has Colonial had a manual that addressed compliance with Rule 105. Tr. 582–83.

### 2. *System in Place Now*

59. Colonial has improved its compliance systems, but still has not established a system adequate to prevent Rule 105 violations.

60. In mid–2004, Colonial installed the EZE Castle system. It provides an automated platform by which traders can report their trade data to Colonial's prime broker. *See* Aronson Decl. ¶¶ 21–22; Tr. 327, 410–11. It also performs several monitoring functions. Tr. 622.

61. Operations personnel input information regarding secondary offerings. Tr. 623–24. This information is inputted after the Colonial syndicate desk indicates an interest in the secondary allocation, but before the allocation shares are received. Tr. 624.

62. Then, if a trader makes a trade that results in a violation of Rule 105, the EZE Castel system sends a monitoring alert to Vince DeMarco. However, the EZE Castle system does not prevent violations of Rule 105 from occurring in the first place. Tr. 627–28. The system merely sends an electronic monitoring alert to operations personnel to let them know that a violation has occurred. *Id.*

63. Another flaw in the EZE Castle system is that it depends on Brody and Miller to disclose to compliance and operations personnel that Colonial is participating in a secondary offering. *See* Tr. 628–30.

64. In addition, many of the employees tasked with Colonial's compliance have insufficient qualifications or training in compliance procedures. The key back office employees, Brennan and Salis, are unlicensed in the securities industry and have no training in rules or regulations regarding securities trading. Tr. 339–40, 777.

65. Miller is an essential link in Colonial's current compliance system. Yet, Brody claims that Miller was responsible for the Rule 105 violations with respect to the shelf offerings. Tr. 589. Additionally, Miller has an extensive disciplinary history, arising from his deliberately providing a customer with false monthly account statements and a false document purporting to be from the New York Stock Exchange. He has been permanently barred by the SEC, New York Stock Exchange and National Association of Securities Dealers. Tr. 449–452

66. The current compliance system also is ineffective because Brody remains in charge and supervises all personnel at Colonial, including all individuals responsible for compliance. Tr. 634, 463–64.

67. Defendants offered an expert witness, Raymond Aronson, to testify as to the effectiveness of their compliance system. The testimony of Aronson was based on one visit to Colonial's office lasting at most eight hours, including an approximately thirty minute meeting with Brody. Tr. 619, 634–35. The "dedicated, well-trained personnel" that he cited in support of his opinion include Brody and the same back office employees that Brody considered sloppy during the relevant period. *See* Aronson Decl. ¶ 27; Tr. 577. They also include the same individuals described above who have little or no securities background or training, have no securities industry licenses, or, in the case of Miller,

have a troublesome disciplinary history in the securities industry.

68. Aronson has had no formal training in computer systems. Tr. 613–14. He was retained to review Colonial's current trading operations and compliance procedures, yet he did not examine the software used by Colonial and admits that he has no understanding of how the software operates. Tr. 620–21. Aronson's opinion was based largely on information and reports provided to him by Colonial personnel. *See* Tr. 621, 635. He did not see how the reports were generated, and he did not recall whether in the time period covered by the reports he reviewed whether Colonial even had any outstanding indications of interest in any secondary offering. Tr. 635–36. Aronson testified that the system had certain capabilities to block trades but he had "no idea mechanically how it does that," then further testified that the system did not in fact do what he initially stated. Tr. 624–26. Aronson acknowledged that the success of the compliance system relied on operations personnel to input that there was an offering, but he apparently did not take into account the origin of the information even though he testified that would be "useful" to know. Tr. 629–30.

69. Defendants' continued failure to implement an effective compliance system raises a substantial risk that defendants will again commit violations of Rule 105.

## F. *Legal Advice*

70. While employed at A.F. Bruan in or about 1995, Brody and Miller learned that restricted period short positions could not be covered with shares received in secondary offerings. J. Miller Decl. ¶ 27; Tr. 424.

71. Upon establishing Colonial in 1998, Brody and Miller sought legal advice from Katten Muchin Rosenman (formerly Ro-senman Colin, then Katten Muchin Zavis) ("KMR"). *See* Tr. 433. KMR attorneys told Brody and Miller that restricted period short positions could not be covered with shares received in secondary allocations. *Id.;* Tr. 812.

72. In approximately June 2002, Brody and Miller were advised by Edward Johnsen, an attorney at KMR, that shares received in a shelf-registered offering could be used to cover restricted period short positions, in compliance with Rule 105. Brody Decl. ¶ 53; Johnsen Decl. ¶¶ 15–16; *see* DX–188.

73. On or about April 27, 2004, Johnsen advised Brody that Rule 105 did not apply to shelf-registered securities. Johnsen Decl. ¶ 22. Johnsen also advised Brody that in the November 2003 Release, the SEC proposed to eliminate the shelf offering exemption from Rule 105. *Id.*

74. On or about May 4, 2004, Brody received an email from Johnsen in which Johnsen had inserted portions of the November 2003 Release relating to Rule 105. PX–277; Brody Decl. ¶ 57; Tr. 659–60. The email also included a link to the entire "proposing release" and an SEC case summary regarding Ascend Capital. PX–277; Tr. 661. In the November 2003 Release, the SEC stated that it "propose[d] eliminating the current shelf offering exception in Rule 105 of Regulation M." 68 Fed. Reg. at 62999.

75. On August 6, 2004, the SEC adopted a final rule, explaining that "in the Proposing Release [of November 2003], we proposed to amend Rule 105 to eliminate the shelf offering exception. We are adopting the amendment as proposed." August 2004 Release, 69 Fed. Reg. at 48020 (footnote omitted). Thus, effective September 7, 2004, the shelf offering exemption to Rule 105 was eliminated.

76. Defendants admit that they violated Rule 105 in connection with MLAN, CBST, NSTK, LM and KEYW. *See* FPTC at 3, 5–6; Tr. 587–88. Defendants claim that they relied on counsel in covering those restricted period short positions because their counsel did not inform them that the SEC had adopted the final rule eliminating the shelf offering exemption from Rule 105. *See* Brody Decl. ¶¶ 16, 47–55. Good faith reliance on counsel is not a defense to liability under Rule 105. *See* August 2004 Release, 69 Fed. Reg. at 48027. But it may be relevant to a determination of the appropriate relief. Here, the Court concludes that defendants did not rely in good faith on the advice of counsel with respect to their unlawful trading in MLAN, CBST, NSTK, LM and KEYW.

77. Johnsen's testimony contradicted Brody's in key areas. Despite Brody's testimony to the contrary, Johnsen indicated that he did not consider KMR to be Colonial's "in-house" counsel and did not have access to Colonial's books and records during the relevant period. Tr. 811. Rather, Johnsen testified that he never provided legal services to Colonial without Colonial first approaching him with specific questions. Johnsen Decl. ¶ 12. Furthermore, Johnsen testified that he had no understanding with Brody during the relevant period that he would alert Brody when proposed Regulation SHO became effective, and it was not his practice to advise Colonial as to changes in the securities laws. Tr. 821–22. Johnsen did acknowledge that Regulation SHO was the topic of financial press at the time of the proposed changes. Tr. 821. No one at KMR looked at any of Colonial's trading documents, or reviewed any specific trades, and no one at KMR ever rendered an opinion to Colonial concerning whether any specific trades violated Rule 105. Tr. 437–38, 602–04, 824–25.

78. No attorney ever advised anyone at Colonial that their trades in MLAN, CBST, NSTK, LM and KEYW, between November and December 2004, were lawful under Rule 105. Colonial could not reasonably have expected that an attorney from KMR would notify Colonial if, and when, the SEC promulgated changes to Rule 105. Moreover, Colonial was placed on notice that the shelf offering exemption might soon be eliminated because Johnsen sent Brody a link to the November 2003 Release, which proposed to eliminate the exemption. *See* PX–277; Tr. 661.

79. Furthermore, defendants provided insufficient details about their activities to KMR. *See* Tr. 824–27, 602–04, 607. For example, Miller testified that he (i) never showed Colonial's trading records to KMR; (ii) did not think that KMR ever reviewed Colonial's trading records; (iii) never discussed with KMR particular transactions and whether specific transactions complied with Rule 105 and did not know of anyone who had such discussions; and (iv) did not know if he ever told KMR that Colonial shorted stock and purchased allocated shares in that same stock in the same account. Tr. 435–38, 458–59.

80. Brody testified that his practice during the relevant time period was to keep himself informed of rules and regulations relating to his trading practices, including monitoring Rule 105 through the use of the internet. Tr. 585. He also admitted that (i) he did not recall showing KMR Colonial's trading records; (ii) prior to December 2004, he never discussed particular transactions with KMR; (iii) he told KMR that Colonial always covered the short positions in the open market; and (iv) he does not recall telling KMR that no one at Colonial instructed prime brokers regarding which shares should be used to

cover which short positions. Tr. 602–07, 660–62.

## III. TRADES AT ISSUE

### A. *Colonial's Trading Practices Generally*

81. The GSEC account through which certain of the trading at issue occurred was the "7SE2" account. This account had a number of subaccounts designated internally at Colonial, but the account was treated as one account by GSEC and executing brokers. Brody Decl. ¶ 17–18, 61. Brody and Miller both traded in a 7SE2 subaccount known as the "listed" subaccount, through which they shared trading profits. Tr. 423.

82. Defendants engaged in a strategy by which they (i) took short positions in stocks, and (ii) at the same time purchased shares in secondary offerings for those stocks. Defense expert DeRosa testified that he had not ever seen a hedge fund indicate an interest in purchasing shares in an offering while also having a short position in that offering. Tr. 790. He testified that the strategy "doesn't make sense" and that he has "never been too certain about why they were doing this" because taking a short position reflects the "view that the share price is going down," whereas indicating an interest in a secondary offering reflects a "bet that the price is going to go up." Tr. 800–01.

83. Both the short positions and the purchases of shares in secondary offerings were designated to the same subaccount— "listed"—and were recorded on blotters for the listed subaccount. Tr. 511; Brody Decl. ¶ 18; DX–203A–R.

84. Defendants depict Colonial's (i) purchase of allocated shares and (ii) covering of restricted period short sales as two unrelated, separate processes within Colonial, handled by two different people. *See* Brody Decl. ¶¶ 11–16; Tr. 435–36. Defense expert DeRosa opined that "this is a case of two strategies going on at the same time. . . ." Tr. 802. Brody testified that Miller determined whether Colonial participated in offerings and sold the allocated stock in the market, while Brody was responsible for using market shares to cover short sales that happened to occur in the restricted period. Brody Decl. ¶¶ 11–16, 54. Brody further testified that Miller only occasionally informed Brody that Colonial had indicated an interest, and rarely told Brody the size of the indication. *Id.* at ¶ 11. Defendants' testimony was not credible and conflicted with more reliable evidence. More likely than not, Brody and Miller were engaged in a unified trading strategy, with Brody possessing full knowledge of Miller's activities.

85. Miller notified Brody on the morning of an allocation as soon as Miller found out that Colonial had received an allocation, which occurred as early as 7:00 a.m. on the day of the offering. Tr. 426, 540; J. Miller Decl. ¶ 23.

86. Both Brody and Miller were involved in Colonial's purchases of shares in secondary offerings. Tr. 414–16. Colonial subscribed to a service that tracked secondary offerings and sent Colonial a weekly report alerting Brody and Miller to upcoming deals. Tr. 416. Both Brody and Miller spoke to syndicate representatives. J. Miller Decl. ¶¶ 12–13. Miller prepared summaries of offerings in which he felt Colonial should participate and shared those summaries with Brody. *Id.* ¶ 17; Tr. 419. Miller testified that he sometimes kept Brody apprised on Colonial's indications of interest in purchasing offered shares. J. Miller Decl. ¶¶ 17–18. Miller spoke to Brody daily about upcoming offerings, and whether he was interested, on behalf of Colonial, in participating in a particular offering and the size of the

indication of interest Miller recommended. *See* J. Miller Decl. ¶¶ 13, 17; Tr. 419. Sometimes Brody was the one who suggested the number of shares in Colonial's indication of interest. J. Miller Decl. ¶ 19. Miller provided Brody with information on most, if not every, deal. Tr. 419. The Court concludes that Brody had substantial input in, and supervisory authority over, the decision whether to participate in a secondary offering. Tr. 336.

87. Brody knew "the firm's positions at all times" and kept track of trades in the account he shared with Miller "as best [he] could." *See* Tr. 510–511. Brody kept the blotters reflecting both his and Miller's trades, so that he "knew where [Colonial] stood all the time before [they] had computers to tell [them] what [their] P & L was." *Id.* Brody and Miller sat adjacent to one another and likely spoke throughout the day. *See* Tr. 317–18, 413–14, 510–11.

88. When Colonial participated in secondary offerings, the allocation "hit" Colonial's account prior to the opening of the market on the allocation date. J. Miller Decl. ¶ 22. Miller and Salis learned even earlier from the syndicate salesperson how many shares Colonial had been allocated. *Id.* Miller informed Brody as soon as he knew on the morning of an allocation that Colonial had received an allocation in a particular offering. Tr. 426, 540.

89. Defendants were notified about and accepted their allocations before syndicate termination, which typically occurred prior to the market opening. *See* Kanterman Decl. ¶ 10; Watson Decl. ¶¶ 12–13. The purchase of allocated stock in each instance was the first purchase in defendants' account on allocation day and occurred by the time each offering terminated prior to the market opening. *See* PX–30–40, PX–43–51, PX–206; Kanterman Decl. ¶ 10; Watson Decl. ¶ 13; J. Miller Decl. ¶ 22.

90. Brody kept trading blotters for the listed subaccount and had access to them at all times. Tr. 509–11. Brody and Miller each testified to having different and inconsistent notations for designating which stock would be used to cover short positions. *See* J. Miller Decl. ¶¶ 42–43; Tr. 516, 522, 739. Brody and Miller each testified that the blotters they kept were "sloppy," and were sometimes rewritten. *See* J. Miller Decl. ¶ 34; Brody Decl. ¶ 39; Tr. 522. Brody testified that he was "sure there were times when [he] got careless" when rewriting his blotters and did not include all notations in his original blotter. Tr. 522. Those blotters were provided to Colonial's back office staff at the end of the day so that information concerning Colonial's trading could be transmitted by the back office staff to Colonial's prime brokers; however, the back office staff also testified that the blotters were often "sloppy and illegible." Salis Decl. ¶ 13; Tr. 404. Salis testified that he could not always tell what various marks on Brody's blotters meant, and sometimes he could not determine which shares were intended to cover a short position. Tr. 348, 404, 406. Despite his own employees' confusion concerning the blotters, Brody testified that he "thought it was pretty evident [to the prime brokers] by my blotters which stock covered the short position." Tr. 515–16. Yet, neither the blotters nor the notations on the blotters were provided to the prime brokers. Tr. 348–49. Both McDonald and Brennan testified that they were never instructed as to what various marks on Brody's blotters meant. Tr. 330–31, 777. Salis testified that Miller did not instruct him as to which shares should be used to cover a particular short position. Tr. 401.

91. Regardless how the blotters were kept, no one at Colonial informed their prime brokers which shares should be

used to cover short positions to avoid violating Rule 105. Tr. 348–49, 515–16. After Salis testified that the back office "made sure that allocated stock did not cover a short position," he was asked how they did that. Tr. 355. Salis responded: "I don't know. I don't know how we did that. We didn't book a cover. I don't even know. I don't know how we did that." *Id.* Salis then admitted that he had been accurate when he previously gave sworn testimony to the SEC stating that there was nothing he or the back office did to make sure that Colonial's trading did not violate Rule 105. *Id.*

## B. *Shelf Offerings*

### 1. *Generally*

92. Defendants admit that shares purchased in secondary offerings were used to cover restricted period short positions in the transactions involving MLAN, CBST, KEYW, NSTK and LM. *See* FPTC at 3, 5–6; Tr. 587–88. As discussed above, defendants claim this happened because they were not told by their attorneys that the SEC had eliminated the shelf offering exception to Rule 105. *See* Brody Decl. ¶¶ 16, 47–55. Defendants now concede that the November 23, 2004 offering of KEYW was not a shelf offering. *See* Stip. 5.29.09 ¶ 6.

93. The evidence establishes that defendants used shares purchased in secondary offerings to cover restricted period short positions in MLAN, CBST, KEYW, NSTK and LM. With respect to these five transactions, Colonial did not purchase sufficient stock in the open market on each allocation date to cover its restricted period short position in that stock, yet Colonial's position in the stock was flat or long by the end of the allocation day. Thus, shares that Colonial purchased in the offering must have been used to cover Colonial's restricted period short positions in

the stock. *See* Ferrante Decl. ¶ 10; PX–52.

### 2. *Specific Offerings*

#### a. *MLAN*

94. On November 19, 2004, Colonial purchased 5,000 shares of MLAN at $27.60 per share in a registered shelf offering. *See* PX–22 at SEC0030239. During the five business days before the pricing of this offering, Colonial sold short a net of 6,174 shares at prices averaging $29.16 per share. *Id.;* PTO Stip. 24. In violation of Rule 105, Colonial used all of its shares purchased in the offering to partially cover its restricted period short position. Defendants concede that they violated Rule 105 in connection with the trades in MLAN. *See* FPTC at 3, 5–6; Tr. 587–88. Colonial realized a profit of approximately $7,783.23 on the portion of its restricted period short position that it covered with the offered shares. Ferrante Decl. ¶ 19.

#### b. *CBST*

95. On November 23, 2004, Colonial purchased 7,000 shares of CBST at $11.20 per share in a registered shelf offering. *See* PX–22 at SEC0030184. During the five business days before the pricing of this offering, Colonial sold short a net of 10,500 CBST shares at prices averaging $10.73 per share. *Id.;* PTO Stip. 26. In violation of Rule 105, Colonial used all of its offered shares to partially cover its short position but sustained a loss of approximately $3,304.70, partly because it did not purchase the offered shares at a price that was lower than the average price at which it sold short during the restricted period. *See* Ferrante Decl. ¶ 19. Defendants concede that they violated Rule 105 in connection with the trades in CBST. *See* FPTC at 3, 5–6; Tr. 587–88.

#### c. *KEYW*

96. On November 23, 2004, Colonial purchased 10,000 shares of KEYW at $16.50 per share in a registered offering. During the five business days before the pricing of this offering, Colonial sold short a net of 5,000 KEYW shares at prices averaging $17.69 per share. *Id.;* PTO Stip. 30. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Defendants concede that they violated Rule 105 in connection with the trades in KEYW. *See* FPTC at 3, 5–6; Tr. 587–88. Colonial realized a profit of approximately $5,960 from the illicit trading. Ferrante Decl. ¶ 19.

#### d. *NSTK*

97. On December 9, 2004, Colonial purchased 25,000 shares of NSTK at $13.50 per share in a registered shelf offering. *See* PX–23 at SEC0153021–022. During the five business days before the pricing of this offering, Colonial sold short a net of 15,400 NSTK shares at prices averaging $15.49 per share. *Id.;* PTO Stip. 32. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $30,638.30 from the illicit trading. Ferrante Decl. ¶ 19. Defendants concede that they violated Rule 105 in connection with the trades in NSTK. *See* FPTC at 3, 5–6; Tr. 587–88.

#### e. *LM*

98. On December 16, 2004, Colonial purchased 5,000 shares of LM at $70.30 per share in a registered shelf offering. *See* PX–23 at SEC0153005. During the five business days before the pricing of this offering, Colonial sold short a net of 10,000 LM shares at prices averaging $69.76 per share. *Id.;* PTO Stip. 36. In violation of Rule 105, Colonial used all of its offered shares to partially cover its short position but sustained a loss of approximately $2,700, partly because it did not purchase the offered shares at a price that was lower than the average price at which it sold short during the restricted period. Ferrante Decl. ¶ 19. Defendants concede that they violated Rule 105 in connection with the trades in LM. *See* FPTC at 3, 5–6; Tr. 587–88.

### C. *Trades Cleared by Banc of America*

#### 1. *Generally*

99. On October 31, 2001 and May 24, 2002, Colonial purchased stock in secondary offerings of ISIL and CRTK respectively. Colonial reported these trades to BAS electronically either through an Excel spreadsheet uploaded through BAS's trade blotter application or by entering the trades directly into trade blotter. *See* Tr. 80, 345; Salis Decl. ¶ 16

100. The data Colonial submitted to BAS indicated that the ISIL and CRTK shares were not allocation shares and that they should be used to cover short positions. Lewis Decl. ¶¶ 16–17. Colonial marked these trades "R"—meaning "regulation commission"—rather than "S"—meaning "syndicate position," a denotation that should be used for stock purchased in a secondary offering. *Id.* ¶¶ 15–17. Colonial also marked the trades that corresponded to the offering allocations "CS"—meaning "cover short"—rather than "BY"—meaning "purchase." The "CS" denotation indicated that these shares should be used to cover Colonial's short position in ISIL and CRTK. *Id.* ¶ 14.

101. The data regarding these trades were submitted by Colonial. Lewis Decl. ¶ 11. There is no credible evidence that that trading data submitted to BAS by Colonial on those dates was altered by

BAS. Colonial traders testified they were not aware of any instance in which BAS had made a change to the order type. Tr. 399–400. There is no evidence that those trades resulted in any trade breaks and, if they did, any such trade breaks would have been resolved prior to the trades settling or clearing. *See* Lewis Decl. ¶ 33; Tr. 399–400.

102. Data concerning the ISIL and CRTK trades were transferred to BAS as a stream of data, time stamped after the receipt of each line, as reflected in the Check Trades report. Tr. 92–93; PX–12, PX–20. BAS made no changes or alterations to the data. Lewis Decl. ¶ 11.

103. BAS's system required defendants to enter a transaction type or order type for each trade, meaning "buy," "sell," "cover short," or "short sale." Tr. 87, 91–92, 147, 149.

104. There is no evidence to support defendants' contention that BAS altered trade data and unilaterally marked Colonial's purchase of allocated stock "cover short." A BAS representative testified that BAS would not populate the required field of order type without customer authorization and would contact the customer if such information was missing. *See* Tr. 147, 149. This testimony comports with common sense. Indeed, an order type is one of the most basic elements of an order. Also, the BAS representative testified that it was BAS's policy not to cover a short position without a specific instruction from a customer to do so. *See* Tr. 147.

105. Although Colonial had problems with BAS, those problems did not involve BAS making alterations to the "order type" of trades specified by Colonial. Brennan, defendants' chief office manager and executive assistant, has no knowledge of BAS ever altering trade data that defendants submitted to BAS. *See* Tr. 776. Defendants' back office supervisor, Salis, is unaware of any instance in which BAS changed an order type. Tr. 399–400.

106. Defendants could access Check Trades and other BAS reports at any time through BAS's system. *See* Tr. 56, 105, 160–61. BAS provided defendants on a daily basis with detailed information concerning the prior days' trades, including a tax lot report that "keeps a record of every purchase, sale, short sale transaction … and [tracks] by its transaction ID which shares are used to collapse, for instance, a purchase or a sale." Tr. 150. Defendants also had the ability to change which shares had been used to cover particular short positions even after settlement date. Tr. 128–131.

107. Defendants reviewed reports from BAS daily. Salis's job was to compare the prime brokers' P & L reports against defendants' reports, and "[i]f there was a di[s]crepancy in the P & L [the back office] would have to find the reason why" and resolve any differences. Tr. 362–63. Each day the back office compared position reports and reconciled the trade information with the prime broker "to make sure [the reports] were right," Tr. 539–40, and reconciled all trade breaks before the trades could settle. Tr. 776. Brennan agreed that all trade breaks were reconciled between BAS and defendants before the trades could settle. *See* Tr. 776.

108. Salis could not recall any instances in which he asked BAS for assistance operating its software, or an instance in which he sought but did not receive help from BAS. Tr. 359–60, 385–86. Defendants could ask their BAS representative "anything" including technical questions, and Salis recalls defendants receiving from BAS answers to such inquiries. Tr. 387–88; *see* Tr. 74–76. Defendants could have contacted their account executive or a help

desk if they had questions concerning reporting particular trades. Tr. 74.

### 2. *Specific Offerings*

#### a. *ISIL*

109. On October 31, 2001, Colonial purchased 425,000 shares of ISIL at $31.50 per share in a registered offering and marked the transaction "CS," meaning "cover short," when it reported the trade to BAS. *See* PX–174A at SEC0135197; PX–20 at SEC0137290. During the five business days before the pricing of this offering, Colonial sold short a net of 270,-700 ISIL shares at prices averaging $33.46 per share. *See* PTO Stip. 13; PX–174C at SEC0135167, 4170, 4191, 4193. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Records from BAS reflect that the allocated shares in fact were used to cover the restricted period short position at a profit of approximately $530,649. *See* PX–19; PX–171 at BAS COL–00032; PX–174A at SEC0135197; *see also* Ferrante Decl. ¶ 19.

110. If Colonial had not entered the "CS" in the type column, those shares would not have been used to cover a preexisting short position. Lewis Decl. ¶ 26. Defendants reported to BAS the commission type for the purchase of allocated shares as "R," meaning "regular commission." *Id.* ¶ 17. Because these were shares purchased in an allocation, they should have been marked "S," meaning "syndicate position." *Id.* ¶ 15. If Colonial had instead entered the code "S," meaning "syndicate position," BAS would not have used the shares to cover a preexisting short position. *Id.* ¶ 27.

111. Defense expert DeRosa formed an opinion, based on Colonial's trade blotter, DX203B, that the shares of ISIL allocated to Colonial in the secondary offering were sold by Colonial into the open market.

DeRosa Decl. ¶ 37. This was based on the two dollar amounts listed on the first and second row on the far right of the "Broker" column on the blotter. Tr. 684–87. These notations purport to record the profit made from selling the 425,000 ISIL shares into the open market. DeRosa Decl. ¶ 37. Colonial's trade blotters are self-serving; they are unreliable because they were inconsistently and sloppily completed; and they were never communicated to Colonial's prime brokers. For these reasons, the information on the trade blotters have low probative value in determining whether Rule 105 violations occurred.

112. DeRosa based his testimony on defendants' blotters alone, and ignored key trading records. DeRosa based his analysis on his interpretation of defendants' handwritten trading blotters without any knowledge of how the blotters were created or maintained. In addition, DeRosa testified the blotters are "very difficult to read" and "frankly, very sloppy." Tr. 794. DeRosa had no basis for disregarding trading records of third parties that reflect that allocated shares were used to cover short positions. Tr. 796–97. He testified that he gave third party records no weight because he did not "know why [Colonial] would want to cover short positions with allocated shares," "[i]t could be just a computer spitting [cover short] out" on the trading records, and "[BAS] might have just gone off and [used allocated shares to cover] itself." Tr. 797–98. DeRosa's opinion testimony, based principally on the trade blotters, is entitled to little weight.

#### b. *CRTK*

113. On May 24, 2002, Colonial purchased 95,000 shares of CRTK at $33 per share in a registered offering and marked the transaction "CS," meaning "cover short," when it reported the transaction to BAS, its prime broker. *See* PX–174A at

SEC0135088; PX–12 at SEC0137269. During the five business days before the pricing of this offering, Colonial sold short a net of 53,900 CRTK shares at prices between $35.79 and $41.12 per share. *See* PTO Stip. 8; PX–52; PX–174B at SEC0135060, 5064, 5073, 5080, 5084. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. BAS's records reflect that the allocated shares in fact were used to cover the entire restricted period short position at a profit of approximately $201,088.64. *See* PX–15; PX–170 at BASOL 00043; PX–174A at SEC0135088; *see also* Ferrante Decl. ¶ 19.

114. If Colonial had not entered "CS" in the "type" column, those shares would not have been used to cover a preexisting short position. Lewis Decl. ¶ 24. Defendants reported to BAS the commission type for the purchase of allocated shares as "R," meaning "regular commission." *Id.* ¶ 16. Because these were shares purchased in an allocation, they should have been marked "S," meaning "syndicate position." *Id.* ¶ 15. If Colonial had instead entered the code "S," meaning "syndicate position," BAS would not have used the shares to cover a preexisting short position. *Id.* ¶ 25.

115. Brody conceded that at least 30,000 of the CRTK allocated shares were used to cover the restricted period short position. Tr. 600, 717. It was Brody's responsibility to ensure that such violations did not occur. Tr. 717. Defendants' expert witness, DeRosa, indicated that Colonial in fact covered part of the restricted period short position in CRTK with allocated shares. Tr. 789. Defendants' witness, Kilbane, also acknowledged that Colonial did not purchase a sufficient quantity of market shares of CRTK to fully cover its restricted period short posi-

tion with non-allocated shares. Tr. 652–54.

### D. *Trades Cleared by GSEC*

#### 1. *Generally*

116. With respect to the first relevant transaction cleared by GSEC—ENDP—Colonial did not purchase sufficient stock in the open market on the allocation date to cover its restricted period short position in that stock, yet Colonial's position in the stock was flat or long by the end of the allocation day. Thus, shares that Colonial purchased in the offering must have been used to cover Colonial's restricted period short positions in the stock. Indeed, defendants admit that they violated Rule 105 with respect to ENDP. Tr. 601, 717, 789.

117. With respect to the ten other non-shelf transactions cleared by GSEC—PTIE, LCCI, TOUS, SPRT, NTOP, KOMG, PSRC, ATAR, WEDC, and ISSI—Colonial did purchase a quantity of stock in the open market on the allocation date sufficient, in theory, to cover Colonial's restricted period short position in that stock. However, it is more likely than not that defendants covered their restricted period short positions with shares from the allocations, in violation of Rule 105. This is because (a) the purchases of shares from the secondary offerings occurred in the exact same "listed" subaccount that contained Colonial's restricted period short positions in those stocks, *see* Tr. 511; Brody Decl. ¶ 18; (b) the allocations occurred prior to the open market purchases, and the use of FIFO meant that stock acquired earlier in time was used to cover existing short positions rather than stock acquired later in time, *see* Tr. 495–97; PX–269 at 9; and (c) Colonial never communicated to GSEC which stock purchases should be used to cover its existing short positions, never requested that its stock be placed in a "1309" short-against-the-box subaccount,

and never even informed GSEC that certain stock was acquired in a secondary offering and not the open market, *see* Salis Decl. ¶ 31; D. Miller Decl. ¶ 22; Tr. 348–49, 515–16, 522, 690–92, 695.

118. With respect to these ten transactions, the SEC further alleges that defendants structured their trading in the offered securities after purchasing shares in the secondary offerings so as to conceal their violative trading. The SEC's evidence is that, after each allocation, defendants bought and sold within a span of about 15 minutes (often much less) approximately the same number of shares in the open market, and the quantity bought or sold equaled or approximated: (a) Colonial's total short position prior to the offering (PTIE, LCCI); (b) Colonial's restricted period short position (TOUS, SPRT, NTOP, KOMG, PSRC, ATAR); or (c) the number of shares Colonial purchased in the offering (WEDC, ISSI). *See* Ferrante Decl. ¶¶ 11–12. The SEC alleges that these were "sham transactions" as described in the SEC interpretive guidance issued on August 6, 2004. August 2004 Release, 69 Fed. Reg. at 48021.

119. It is not necessary for the Court to determine whether these post-allocation trades were "sham transactions" or not. The Rule 105 violations were complete after Colonial purchased the stock in the secondary offerings. Colonial already had restricted period short positions in the same subaccount, used FIFO, and never instructed GSEC not to use the allocation stock to cover its short position. Post-allocation trading could not undo the Rule 105 violations.

120. These post-allocation trades were an effort to create the false appearance to third parties and regulators that defendants had not used allocation stock to cover their restricted period short positions, when in fact they had. Brody could pro-vide no explanation for this pattern of trading other than it was a "coincidence." Tr. 528–29. That explanation is not credible, given the number of instances this pattern occurred, and the fact that the trading occurred in the "listed" subaccount, which Brody oversaw, traded in and for which he shared trading profits. *See* 429–30, 509–11. In almost every instance, the post-allocation buys and sells created a trading loss, albeit small compared to the profit Colonial realized by covering restricted period short positions with allocated shares. *See* Ferrante Decl. ¶ 19. Brody admitted he kept constant watch over the subaccount's P & L and maintained the daily trading blotter. It is not credible that Brody did not know exactly what trading took place in the listed subaccount on a real-time basis.

### 2. *Specific Offerings*

#### a. *ENDP*

121. On July 2, 2003, Colonial purchased 202,000 shares of ENDP at $15.50 per share in a registered offering. *See* PX–24 at SEC0109590. The syndicate terminated at 8:55 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–30. The allocated shares were Colonial's first purchase of ENDP shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 162,000 ENDP shares at prices of $16.53 and $16.16 per share. *Id.*; PTO Stip. 19. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. At the end of the day of allocation, Colonial had a long position of 24,500, which it sold on July 18, 2003 to flatten its position. Colonial realized a profit of approximately $136,670.85 from the illicit trading. Ferrante Decl. ¶ 19.

122. Brody conceded that Colonial used 9,500 of the allocated ENDP shares in violation or Rule 105, because Colonial fully covered its restricted period short position of 162,000 shares yet only made market purchases of 152,500 shares. Tr. 601, 717. Defendants' expert witness, DeRosa, acknowledged that some portion of the allocated ENDP shares were used to cover the restricted period short position. Tr. 789. Defendants' witness, Kilbane, conceded that "[Colonial] did not cover their restricted position with the purchases in the open market positions [sic] in the day." Tr. 653–54.

### b. *TOUS*

123. On November 14, 2003, Colonial purchased 25,000 shares of TOUS at $26 per share in a registered offering. The syndicate terminated at 8:35 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–37. The allocated shares were Colonial's first purchase of TOUS shares that day. During the five business days before the pricing of this offering, Colonial sold short a net 10,200 TOUS shares at prices averaging $29.37 per share. PTO Stip. 39. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $34,376.83 from the illicit trading. Ferrante Decl. ¶ 19.

124. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker to purchase 10,200 TOUS shares and sell 10,-200 TOUS shares—the same number of shares that it was previously short. PX–52D. Knight executed both the buy and the sell orders at a price of $26.08 per share, and charged a commission of .015 on each side of the trade. Williams Decl.

¶ 21; *see* Tr. 562–63. The purchase and corresponding sale of 10,200 shares occurred within 24 seconds with no net gain or loss. PX–52D; *see* Ferrante Decl. ¶ 19. Colonial paid a commission of .015 per share. PX–52D; *see* Ferrante Decl. ¶ 19. Colonial's purchase and sale, within seconds, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in TOUS, when in fact it had.

125. Defendants argue that, on DX–203I, the arrows pointing from the sale of 14,800 and 10,200 shares of TOUS to the purchase of 25,000 shares of TOUS represent that the two sales were made from the shares that Colonial received in the TOUS allocation. J. Miller Decl. ¶ 43; Tr. 691. As discussed, not only were Colonial's blotters self-serving, inconsistent, and sloppy, and thus unreliable, but also this information was never communicated to GSEC. Thus, the evidence from DX–203I is outweighed by all the countervailing evidence that Colonial used allocation stock to cover its restricted period short position in TOUS.

### c. *SPRT*

126. On November 19, 2003, Colonial purchased 50,000 shares of SPRT at $12 per share in a registered offering. PX–24 at SEC0109602. The syndicate terminated at 9:00 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–36. The allocated shares were defendants' first purchase of SPRT shares that day. During the five business days before the pricing of this offering, Colonial sold short a net 25,000 SPRT shares at prices averaging $12.27 per share. *Id.*; PTO Stip. 42. In violation of Rule 105, Colonial fully covered

its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $6,755 from the illicit trading. Ferrante Decl. ¶ 19.

127. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker to purchase 25,000 SPRT shares and sell 25,000 SPRT shares—the same number of shares that it was previously short. PX–60. The purchase and corresponding sale of 25,000 shares occurred within four seconds at a loss of approximately $750. *See* PX–60; PX–52 at 10; Ferrante Decl. ¶ 19. Colonial's purchase and sale, within seconds, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in SPRT, when in fact it had.

128. Defendants argue that, on DX–203J, the term "cover short," located six columns from the left and ten rows down, indicates that 25,000 shares of SPRT were purchased in the open market at an average price of $12.33 to cover the 25,000 shares that Colonial was short coming into that trading day. J. Miller Decl. ¶ 42. As discussed, not only were Colonial's blotters self-serving, inconsistent, and sloppy, and thus unreliable, but also this information was never communicated to GSEC. Thus, the evidence from DX–203J is outweighed by all the countervailing evidence that Colonial used allocation stock to cover its restricted period short position in SPRT.

#### d. *WEDC*

129. On July 2, 2003, Colonial purchased 15,000 shares of WEDC at $10 per share in a registered offering. PX–24 at SEC0109593. The syndicate terminated at 9:00 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–55. The allocated shares were Colonial's first purchase of WEDC shares that day. During the five business days before the pricing of this offering, Colonial sold short a net 25,000 WEDC shares at prices averaging $10.55 per share. *Id.;* PTO Stip. 48. In violation of Rule 105, Colonial partially covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $8,230.50 from the illicit trading. Ferrante Decl. ¶ 19.

130. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker within less than two minutes to purchase 15,000 WEDC shares and sell 15,000 WEDC shares—the same number of shares that it purchased in the offering. *See* PX–52A at 22. Colonial had a net loss of approximately $1,242 on the purchase of 15,000 shares and corresponding sale of 15,000 shares. *See* Ferrante Dec. ¶ 19; PX–52A at 22. Colonial's purchase and sale, within minutes, of the exact same number of shares that it purchased in the offering was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in WEDC, when in fact it had.

131. Defendants argue that, on DX–203K, a squiggly line across the blotter indicates that Colonial fully covered its restricted period short position by purchasing 25,000 shares of WEDC in the open market. Brody Decl. ¶ 34. As discussed, not only were Colonial's blotters self-serving, inconsistent, and sloppy, and thus unreliable, but also this information was never communicated to GSEC. Thus, the evidence from DX–203K is outweighed

by all the countervailing evidence that Colonial used allocation stock to partially cover its restricted period short position in WEDC.

### e. *NTOP*

132. On November 20, 2003, Colonial purchased 450,000 shares of NTOP at $4.50 per share in a registered offering. PX–24 at SEC0109600–01. Defendants acknowledged Colonial's purchase of allocated shares at 8:18 a.m., which was Colonial's first purchase of NTOP shares that day. *See* PX–177A at SEC0162517. During the five business days before the pricing of this offering, Colonial sold short a net of 250,000 NTOP shares at prices averaging $5.17 per share. *Id.;* PTO Stip. 53. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $167,451.96 from the illicit trading. Ferrante Decl. ¶ 19.

133. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker to buy 250,000 NTOP shares and sell 250,000 NTOP shares—the same number of shares that it was previously short. It also appears that Colonial directed the executing broker to cross the sell order with the buy order at the same price. PX–52F. The executing broker's records indicate that the trade represented a cross. Williams Decl. ¶ 17. The executing broker's registered representative testified that it was his practice only to cross trades upon instructions from a client. Williams ¶ 18; Fradella ¶ 13; Tr. 247. When the executing broker entered a cross trade, the buys and sells were in fact crossed with Knight in between the trade. Tr. 258–59. The purchase of 250,000 shares at a price of $4.65 and sale of 250,000 shares at a price

of $4.62 occurred within less than four minutes. PX–52F. The executing broker's commissions were embedded in the prices. Williams Decl. ¶ 21. That is, the difference between the prices on the corresponding buys and sells amounted to the executing broker's commissions. *Id.* Colonial's net loss from the corresponding NTOP purchase and sale was approximately $7,500, representing the commissions embedded into the prices to compensate Knight for executing the transactions. *See* Williams Decl. ¶ 21; Ferrante Decl. ¶ 19; PX–52F. Colonial's purchase and sale, within minutes, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in NTOP, when in fact it had.

### f. *KOMG*

134. On January 23, 2004, Colonial purchased 50,000 shares of KOMG at $20 per share in a registered offering. PX–24 at SEC0109605. The underwriter's sales force was notified about the allocations for their clients at 8:41 a.m., and clients typically were notified shortly thereafter. *See* PX–218. Thus, more likely than not, Colonial knew it had been allocated stock prior to engaging in any open market trading of KOMG on that day. During the five business days before the pricing of this offering, Colonial sold short a net of 4,000 KOMG shares at prices averaging $21.50 per share. *Id.;* PTO Stip. 56. In violation of Rule 105, Colonial fully covered its restricted period short position with shares it earlier purchased in the offering. Colonial realized a profit of approximately $6,000 from the illicit trading. Ferrante Decl. ¶ 19.

135. After violating Rule 105 by covering its restricted period short position with

shares purchased in the offering, Colonial placed orders through the same broker within approximately nine minutes to buy 4,000 KOMG shares and sell 4,000 KOMG shares—the same number of shares that it was previously short. PX–52A at 7. Colonial had a net loss of $161 on the corresponding purchases and sales. *Id.;* Ferrante Decl. ¶ 19. Colonial's purchase and sale, within minutes, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in KOMG, when in fact it had.

### g. *PSRC*

136. On April 2, 2004, Colonial purchased 20,000 shares of PSRC at $18 per share in a registered offering. PX–24 at SEC0109612. The syndicate terminated at 9:00 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–40; Watson Decl. ¶ 20. The allocated shares were Colonial's first purchase of PSRC shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 15,800 PSRC shares at prices averaging $18.70 per share. *Id.;* PTO Stip. 59. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $11,042.39 from the illicit trading. Ferrante Decl. ¶ 19.

137. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker within approximately two minutes to buy 15,800 PSRC shares and sell 15,800 PSRC shares—the same number of shares that it was previously short. PX–52A at 13. Colonial had a net loss of $771 on the corresponding purchases and sales. *See* Ferrante Dec. ¶ 19; PX–52A at 13. Colonial's purchase and sale, within minutes, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in PSRC, when in fact it had.

138. Defendants argue that, on DX–203N, the dollar notations in the "Broker" column indicate that Colonial purchased 15,800 shares of PSRC from the open market to cover its restricted period short position. Tr. 693–94. As discussed, not only were Colonial's blotters self-serving, inconsistent, and sloppy, and thus unreliable, but also this information was never communicated to GSEC. Thus, the evidence from DX–203N is outweighed by all the countervailing evidence that Colonial used allocation stock to cover its restricted period short position in PSRC.

### h. *ISSI*

139. On January 29, 2004, Colonial purchased 20,000 shares of ISSI at $16.50 per share in a registered offering. PX–24 at SEC0109608. The syndicate terminated at 9:05 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–39. The allocated shares were Colonial's first purchase of ISSI shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 42,500 ISSI shares at prices averaging $17.37 per share. *Id.;* PTO Stip. 62. In violation of Rule 105, Colonial partially covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $17,354 from the illicit trading. Ferrante Decl. ¶ 19.

140. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Co-

lonial placed orders through the same broker within approximately one minute to buy 20,000 ISSI shares and sell 20,000 ISSI shares—the same number of shares it purchased in the offering. PX–52A at 6. Colonial had a net loss of $1,621 on the corresponding purchases and sales. *Id.;* Ferrante Decl. ¶ 19. Colonial's purchase and sale, within approximately one minute, of the exact same number of shares that it purchased in the offering was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in ISSI, when in fact it had.

### i. PTIE

141. On September 22, 2003, Colonial purchased 225,000 shares of PTIE at $6.50 per share in a registered offering. PX–24 at SEC0109596. The syndicate terminated at 9:20 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–34. The allocated shares were Colonial's first purchase of PTIE shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 84,167 PTIE shares at prices averaging $6.79 per share. *Id.;* PTO Stip. 65. Colonial's overall short position was 90,000 shares because it also sold short prior to the restricted period. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $24,221.34 from the illicit trading. Ferrante Decl. ¶ 19.

142. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same broker within approximately two minutes to buy 90,000 PTIE shares and sell 90,000 PTIE

shares—the same number as its total pre-offering short position, which included its restricted period short position. PX–52A at 15. Colonial had a net loss of $58 on the corresponding purchases and sales. Ferrante Decl. ¶ 19; PX–52A at 15. Colonial's purchase and sale, within minutes, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in PTIE, when in fact it had.

### j. ATAR

143. On September 19, 2003, Colonial purchased 1,018,000 shares of ATAR at $4.25 per share in a registered offering. PX–24 at SEC0109595. The syndicate terminated at 9:20 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–32. The allocated shares were Colonial's first purchase of ATAR shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 525,000 shares at prices averaging $4.77 per share. *Id.;* PTO Stip. 68. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $274,660.40 from the illicit trading. Ferrante Decl. ¶ 19.

144. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed three pairs of orders through the same executing broker to buy and sell a total of 543,000 ATAR shares, which roughly approximated the number of shares as its restricted period short position.[6] PX–52G. The executing broker's

---

6. Defendants' original blotter for these transactions reflects that defendants initially recorded the quantity as "525,000"—the amount of the restricted period short posi-

commissions were embedded in the prices. Williams Decl. ¶ 21. That is, the difference between the prices on the corresponding buys and sells amounted to the executing broker's commissions. *Id.* The purchase and sale of the 543,000 shares was accomplished within approximately one hour by three sets of buy and sell transactions of equal amounts (143,000 shares, 200,000 shares and 200,000 shares). *See* Williams Decl. ¶ 13; PX–52G. At most about 15 minutes separated each buy from its corresponding sale. *See* PX–52G. Colonial's net loss from the corresponding ATAR purchases and sales was approximately $23,131.80, an amount that represents the commissions embedded into the prices to compensate Knight for executing the transactions. *See* Williams Decl. ¶ 21; Tr. 561; Ferrante Decl. ¶ 19; PX–52G. Colonial's purchase and sale, within approximately one hour, of approximately same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in ATAR, when in fact it had.

**k.** *LCCI*

145. On November 24, 2003, Colonial purchased 100,000 shares of LCCI shares at a price of $4.10 per share in a registered offering. PX–24 at SEC0109598–99. The syndicate terminated at 8:40 a.m., thus defendants acknowledged Colonial's purchase of the allocated shares by that time. *See* PX–33. The allocated shares were Colonial's first purchase of LCCI shares that day. During the five business days before the pricing of this offering, Colonial sold short a net of 30,200 shares at prices averaging $4.80 per share. *Id.;* PTO Stip. 72. Colonial's overall short position was 40,700 shares because it also sold short prior to

the restricted period. In violation of Rule 105, Colonial fully covered its restricted period short position with shares purchased in the offering. Colonial realized a profit of approximately $21,159.02 from the illicit trading. Ferrante Decl. ¶ 19.

146. After violating Rule 105 by covering its restricted period short position with shares purchased in the offering, Colonial placed orders through the same executing broker to buy 40,700 shares and sell 40,700 LCCI shares—the same number as its total pre-offering short position, which included its restricted period short position. It appears that Colonial directed the executing broker to cross the sell order with the buy order at the same price. PX–52H; Fradella Decl. ¶ 11; Williams Decl. ¶ 15–17. The executing broker's records indicate that the trade represented a cross. Williams Decl. ¶ 17. The executing broker's registered representative testified that it was his practice only to cross trades upon instructions from a client. *Id.* ¶ 18; Fradella Decl. ¶ 13; Tr. 247. When the executing broker entered a cross trade, the buys and sells were in fact crossed with Knight in between the trade. *See* Tr. 258–59. The executing broker's commissions were embedded in the prices, which were $4.45 per share sold and $4.48 per share purchased. Williams Decl. ¶ 21. That is, the difference between the prices on the corresponding buys and sells amounted to the executing broker's commissions. *Id.;* Tr. 563. The purchase and sale of 40,700 shares occurred within approximately four minutes. PX–52H. Colonial's net loss from the corresponding LCCI purchase and sale was approximately $1,221, representing the commissions embedded into the prices to compensate Knight for executing the transactions. *See* Williams Decl. ¶ 21; Ferrante Decl. ¶ 19;

tion—but erased it and entered "543,000." PX–287.

PX–52H. Colonial's purchase and sale, within minutes, of the exact same number of shares that it was previously short was an effort to create the false appearance to third parties and regulators that it had not used allocation stock to cover its restricted period short position in LCCI, when in fact it had.

147. Defendants argue that, on DX–203R, a profit figure listed in the upper-right box can only be arrived at by assuming that the allocation stock was sold into the open market and that the short position was covered with open market purchases. DeRosa Decl. ¶ 40. As discussed, not only were Colonial's blotters self-serving, inconsistent, and sloppy, and thus unreliable, but also this information was never communicated to GSEC. Thus, the evidence from DX–203R is outweighed by all the countervailing evidence that Colonial used allocation stock to cover its restricted period short position in LCCI.

## IV. DEFENDANTS' MENTAL STATE

148. Although Brody "understood the language" of Rule 105, he claims that he "did not have a clear understanding of the purpose" of the rule. Tr. 517. Yet, he testified that Colonial was "a small hedge fund" and could "not affect[ ] the pricing [of a secondary offering]. No one can affect the pricing[,] the marketplace is so much bigger than me there was no way I could affect the pricing.... I didn't think we affected the market at all. So I didn't think, I wasn't big enough to force the pricing of a deal down." Tr. 517–18. This testimony indicates that Brody understood the purpose of Rule 105 but either disagreed with the theory underlying the rule or believed that the purpose of the rule would not be furthered by Colonial complying with it.

149. With respect to the MLAN, CBST, KEYW, NSTK and LM offerings, defendants believed that these were shelf offerings and believed that shelf offerings were exempt from Rule 105. First, defendants acted recklessly in determining whether an offering was a shelf offering. For example, as defendants now concede, KEYW was not a shelf offering at all. *See* Stip. 5.29.09 ¶ 6. Defendants did not have a consistent, reliable procedure for determining whether an offering was shelf-registered or not. Second, defendants also acted recklessly in expecting that lawyers from KMR would alert them if, and when, the SEC promulgated changes to Rule 105. There was no basis for Colonial to believe that any KMR lawyer was analogous to an in-house counsel. It was defendants' responsibility to stay abreast of applicable SEC regulations. Brody acted recklessly given the fact that Johnsen sent Brody an internet link to the November 2003 Release, which proposed to eliminate the shelf offering exemption, thereby putting Brody on notice that Rule 105 might soon be amended. PX–277; Tr. 661.

150. With respect to the trades cleared by BAS—ISIL and CRTK—it is more likely than not that defendants intended that the allocated shares be used to cover their restricted period short positions. A number of BAS reports, which were available to Colonial and which also showed up on Colonial's monthly account statements from BAS, showed that the allocated shares were used to cover short positions. Lewis Decl. ¶¶ 18–23; PX–174A; PX–15; PX–19. It is more likely than not that defendants intentionally reported the allocations of ISIL and CRTK stock to BAS using the codes "CS," meaning "cover short," and "R," meaning "regular commission," and that defendants knew and intended that BAS would therefore use the allocated stock to cover Colonial's restricted period short positions in ISIL and CRTK.

151. With respect to the remaining trades cleared by GSEC, it is more likely than not that defendants intended that the allocated shares be used to cover restricted period short positions. Had defendants wanted to avoid violating Rule 105, they could simply have informed GSEC that certain newly purchased stock was acquired in a secondary offering and should not be used to cover an existing short position. It is not credible that defendants believed that they would avoid violating Rule 105 merely by making occasional, sloppy markings on their blotters—sometimes arrows, sometimes squiggly lines, sometimes a P & L calculation—which were not always comprehensible to the back office personnel and which were not even communicated to GSEC. Moreover, defendants' post-allocation trading in WEDC, ATAR, PTIE, TOUS, SPRT, NTOP, LCCI, KOMG, ISSI, and PSRC demonstrates that defendants sought to create the false appearance to third parties and regulators that Colonial had not used allocation stock to cover its restricted period short positions, when in fact it had.

152. As of July 17, 2003, defendants had actual notice that the SEC was investigating their participation in certain equity offerings. *See* Tr. 607. Yet, fourteen of the violations occurred after this date.

### *CONCLUSIONS OF LAW*

1. The SEC has charged defendants with multiple violations of Rule 105 of Regulation M under the Exchange Act. 17 C.F.R. § 242.105; *see also* 15 U.S.C. § 78u(d)(1). The SEC seeks a final judgment (i) permanently enjoining defendants from further violations of Rule 105; (ii) ordering defendants to disgorge any ill-gotten gains including prejudgment interest thereon; and (iii) imposing a civil money penalty on Brody.

## I. RULE 105 VIOLATIONS

2. At all relevant times, Rule 105 provided, in pertinent part, that "[i]n connection with an offering of securities for cash pursuant to a registration statement ... filed under the Securities Act, it shall be unlawful for any person to cover a short sale with offered securities purchased from an underwriter or broker or dealer participating in the offering, if such short sale occurred during ... [t]he period beginning five business days before the pricing of the offered securities and ending with such pricing...." 17 C.F.R. § 242.105(a) (2006).

3. Rule 105's prohibitions are prophylactic and apply irrespective of a short seller's intent in effecting the short sale. *See* August 2004 Release, 69 Fed. Reg. at 48027. In adopting the Rule, the Commission reasoned that "a prophylactic approach to anti-manipulation regulation is the most effective means to protect the integrity of the offering process by precluding activities that could influence artificially the market for the offered security." December 1996 Release, 1996 WL 734255, at *2.

4. Defendants CIM, Colonial and Brody, directly or indirectly, by the use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of a facility of a national securities exchange, violated Rule 105 by covering short sales made during the period beginning five days before the pricing of the offering securities with offered securities purchased in those offerings.

5. The violative transactions occurred on Oct. 31, 2001 (ISIL); May 24, 2002 (CRTK); July 2, 2003 (ENDP and WEDC); Sept. 19, 2003 (ATAR); Sept. 22, 2003 (PTIE); Nov. 14, 2003 (TOUS); Nov. 19, 2003 (SPRT); Nov. 20, 2003 (NTOP);

Nov. 24, 2003 (LCCI); Jan. 23, 2004 (KOMG); Jan. 29, 2004 (ISSI); Apr. 2, 2004 (PSRC); Nov. 19, 2004 (MLAN); Nov. 23, 2004 (CBST and KEYW); Dec. 9, 2004 (NSTK); and Dec. 16, 2004(LM).

## II. RELIEF

### A. *Permanent Injunction Against Future Violations*

■ 6. The Exchange Act permits the SEC to seek a permanent injunction against "any person [who] is engaged or is about to engage in acts or practices constituting a violation" of a rule or regulation. 15 U.S.C. § 78u(d)(1). To obtain such relief, the SEC must show that (1) violations of the securities laws have occurred, and (2) a substantial likelihood exists that violations will occur in the future. *See SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99 (2d Cir.1978); *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998).

7. "In order to obtain injunctive relief, the SEC need not allege violations of Rule 105 in its current form. It is sufficient that the conduct it seeks to restrain is the same or similar to the illegal conduct which defendants have committed in the past." *SEC v. Colonial Inv. Mgmt. LLC*, 07 Civ. 8849(PKC) (Order Denying Mot. to Dismiss), 2008 WL 2191764, at *4 (S.D.N.Y. May 23, 2008) (citing *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from defendant's conduct in the past.")).

■ 8. To determine whether a permanent injunction is appropriate, courts look at the following factors: "[1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an 'isolated occurrence;' [4] whether defendant continues to maintain that his past conduct was blameless; and [5] whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *Cavanagh*, 155 F.3d at 135 (footnote omitted) (quotation omitted).

■ 9. First, defendants have been found liable for violating Rule 105.

10. Second, defendants acted with a significant degree of scienter. With respect to MLAN, CBST, KEYW, NSTK, and LM, defendants acted recklessly. With respect to all other violations, defendants acted knowingly, intentionally, and willfully.

11. Third, the SEC has established eighteen violations between 2001 and 2004. The violations go far beyond an isolated occurrence.

12. Fourth, defendants refuse to accept responsibility for their violations of Rule 105. With few exceptions, Brody insists that defendants did not violate Rule 105. *See* Tr. 519–20, 576–77. In fact, defendants seek to blame nearly everyone except themselves, including (i) GSEC, for not preventing allocated stock from covering restricted period short positions, even though Colonial never gave GSEC instructions about which shares to use to cover, Tr. 515–16; (ii) BAS, for allegedly having defective records and systems, Tr. 502–05; Salis Decl. ¶¶ 21–22, 42; (iii) KMR, their outside counsel, for allegedly giving defective advice regarding those offerings as to which defendants admit liability, *see* Brody Decl. ¶¶ 47–55; Tr. 521, 589; and (iv) the SEC, for allegedly being vague concerning Rule 105, Tr. 519–20.

13. Fifth, defendants remain in a position where future violations of amended

Rule 105 may occur. Brody testified that Colonial continues to take short positions and still participates and receives allocations in secondary offerings. Tr. 722. Although Brody testified that Colonial will not participate in a secondary offering of a stock in which it has a short position, the compliance system in place at Colonial does not prevent violations from occurring. Moreover, the compliance system depends upon the very people responsible for the misconduct in this case.

14. Rule 105 was amended in 2007 to create an outright prohibition on purchasing a security in a registered offering if the buyer has a restricted period short position in that security. *See* August 2007 Release, 2007 WL 2254466, at *5 (explaining that the new Rule 105 "provides a bright line demarcation of prohibited conduct") (footnote omitted). True, this outright prohibition makes it unlikely that defendants will endeavor to violate the new Rule 105 in the precise manner in which they violated the old Rule 105. But defendants' motive to reduce the risk in their short selling remains unabated. The Court need not spell out how an intelligent and motivated trader might evade the new Rule, nor await the development of more sophisticated evasive techniques in order to comfortably conclude that the danger of further violations is present.

15. It is substantially likely that, unless enjoined by the Court, defendants will engage in acts and practices that violate Rule 105. Thus, defendants are hereby permanently enjoined from violating Rule 105.

## B. *Disgorgement*

■ 16. Disgorgement of illicit profits is a proper equitable remedy for violations of the securities laws. *See SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987) (disgorgement "is a method of forcing a defendant to give up the amount by which

he was unjustly enriched") (quotation omitted) (footnote omitted). A district court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1474–75 (2d Cir.1996).

17. "The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997). Because the distribution of disgorged profits to fraud victims is a secondary goal, "the size of a disgorgement order 'need not be tied to the losses suffered by defrauded investors.'" *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 81 (2d Cir.2006) (quoting *Fischbach Corp.,* 133 F.3d at 175–76).

■ 18. Once the SEC has made a reasonable showing of a defendant's illicit profits, the burden shifts to the defendants to show that the disgorgement figure is not a reasonable approximation. Ultimately, the SEC bears the burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment. *See SEC v. Opulentica, LLC,* 479 F.Supp.2d 319, 330 (S.D.N.Y.2007).

19. The net profit to defendants from the eighteen violative transactions was $1,478,036.76. *See* Ferrante Decl. ¶¶ 18–19.

20. "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion.... In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award,

(iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.... When the SEC itself orders disgorgement ... the interest rate it imposes is generally the IRS underpayment rate, ... [which] reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal activity]." *First Jersey*, 101 F.3d at 1476. These factors all weigh in favor of granting prejudgment interest at the IRS underpayment rate.

21. Considering the evidence adduced at trial, and the arguments advanced by the intervenors, it would be inequitable to hold all defendants jointly and severally liable for the full amount of disgorgement. "Although the court has the discretion to find joint and several liability when two or more defendants have collaborated in the illegal conduct ... courts have declined to do so where defendants have differing levels of culpability." *Opulentica, LLC*, 479 F.Supp.2d at 330 (citation omitted). Indeed, if all defendants were held jointly and severally liable, there would be a significant risk that Brody would cause the disgorgement obligation to fall disproportionately and unfairly on Colonial. Although Brody is currently the largest investor in Colonial, there are also several innocent, outside investors, such as those who have intervened in this action. Tr. 666. CIM is the managing member of Colonial, and Brody and Miller are the only two principals of CIM. Because Brody was simultaneously an investor in Colonial, a trader at Colonial, and a principal of CIM, the innocent, outside investors in Colonial did not profit from the Rule 105 violations to the same extent as did Brody and CIM. However, the evidence in this case does not permit the Court to determine with exactitude the precise amount that each individual profited from each

unlawful transaction. Brody testified that the trader payout for the "listed" account, through which the violative trading occurred, was up to 65% of the profits in certain years. Tr. at 429, 469. In other years, the payout decreased to 40%. Tr. at 471. In at least certain years, 20% of the funds that remained after paying traders and expenses was paid to CIM as an incentive fee. Tr. 470–71.

■■■ 22. In light of these facts, the totality of the circumstances and a balancing of the equities, the Court concludes that CIM and Brody are jointly liable for 67% of the total amount of disgorgement (*i.e.*, $990,284.63), plus prejudgment interest thereon and Colonial is only liable for 33% of the total amount of disgorgement (*i.e.*, $487,752.13), plus prejudgment interest thereon. Prejudgment interest shall be paid at the IRS underpayment rate, calculated from December 16, 2004 through the date of the entry of judgment.

### C. *Civil Monetary Penalty*

23. The Exchange Act authorizes the Court to order civil monetary penalties for the violations at issue. 15 U.S.C. § 78u(d)(3); *see SEC v. Palmisano*, 135 F.3d 860, 865 (2d Cir.1998). The SEC seeks to have a penalty imposed on Brody, but not on CIM or Colonial. (*See* Amended Compl. at 18 ¶ III.)

24. The Exchange Act provides three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation. 15 U.S.C. § 78u(d)(3); *see also* 17 C.F.R. § 201.1001. In the first tier, for non-scienter violations, the penalty cannot exceed (a) the greater of $6,500, or (b) the gross amount of pecuniary gain to the defendant as a result of the violation. In the second tier, where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disre-

gard of a regulatory requirement," the penalty cannot exceed the greater of (a) $60,000, or (b) the gross amount of pecuniary gain to the defendant as a result of the violation. And in the third tier, where the violation (i) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," the penalty cannot exceed the greater of (a) $120,000, or (b) the gross amount of pecuniary gain to the defendant as a result of the violation. 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1001.

25. The amount of the penalty should be determined "in light of the facts and circumstances" surrounding the violations. 15 U.S.C. § 78u(d)(3). "Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *Opulentica, LLC,* 479 F.Supp.2d at 331; *see also SEC v. Ramoil Mgmt., Ltd.,* 01 Civ. 9057(SC), 2007 WL 3146943, at *13 (S.D.N.Y. Oct. 25, 2007) (noting that civil penalties "are intended to fulfill a number of … important purposes [other than punishment] such as disgorgement of ill-gotten gains, deterrence, fostering public confidence in the securities system, and promoting stability in the securities market"). Factors that are relevant to a determination of whether a civil penalty is appropriate, and the amount of the fine, include (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *See Opulentica, LLC,* 479 F.Supp.2d at 331. "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" *Id.* (quoting *SEC v. Moran,* 944 F.Supp. 286, 296–97 (S.D.N.Y.1996)).

26. The evidence establishes that Brody's unlawful actions involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. Thus, a second tier penalty is appropriate.

27. On balance, these factors establish that Brody should be subject to a severe penalty, but not the maximum one. Thus, Brody is ordered to pay a penalty in the amount of $25,000 per violation, totaling $450,000.

### CONCLUSION

For the foregoing reasons, the Court concludes that defendants violated Rule 105. Defendants are permanently enjoined from violating Rule 105 in the future. CIM and Brody are jointly liable for disgorgement in the amount of $990,284.63 plus prejudgment interest, and Colonial is liable for disgorgement in the amount of $487,752.13 plus prejudgment interest. Brody shall pay a civil penalty of $450,000. The SEC is directed to calculate prejudgment interest at the IRS underpayment rate, from December 16, 2004 through the date of the entry of this judgment, and to submit to the Court a proposed final judgment.

SO ORDERED.